FILED
CLERK

8:26 am, Jul 07, 2023

U.S. DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
LONG ISLAND OFFICE

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA, . Criminal No.  22-cr-00344-GRB-JMW-1
.
        Vs.           . 100 Federal Plaza
                . Central Islip, NY  11722
RAMI SAAB,          .
a/k/a RAMI HASAN     . DATE: June 5, 2023
. . . . . . . . . . . . .

TRANSCRIPT OF DETENTION HEARING
BEFORE HONORABLE GARY R BROWN
UNITED STATES DISTRICT JUDGE

APPEARANCES:

For the Government:     UNITED STATES ATTORNEYS OFFICE
                         EASTERN DISTRICT OF NEW YORK
                         BY:  MICHAL R. MAFFEI, ESQ.
                             ANTHONY BAGNUOLA, ESQ.
                         610 Federal Plaza
                         Central Islip,  NY  11722

For the Defendant:      SUSAN GAIL KELLMAN, ESQ.
                         25 Eighth  Avenue
                         Brooklyn, NY  11217

Proceedings recorded by electronic sound recording, transcript
produced by transcription service.

TRACY GRIBBEN TRANSCRIPTION, LLC
PO BOX 688
Middletown, NJ 07748
(732) 263-0044    Fax No. 732-865-7179
800 603-6212
www.tgribbentranscription.com

2

1                         I N D E X

2

3

4    ORAL ARGUMENT                    PAGE

5         BY MR. MAFFEI              3/12/26

6         BY MS. KELLMAN            5/18/29

7    DECISION                          31

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

3

1          THE CLERK:  Calling case, 22-criminal-344 USA versus

2    Rami Saab. Counsel please state your appearance for the record.

3          MR. MAFFEI:  Michael Maffei and Anthony Bagnuola for

4    the United States. Good afternoon, Your Honor.

5          THE COURT:  Just the use the microphones, because we

6    have somebody on the phone.  On the phone, who do we have?

7          MS. KELLMAN:  Susan Kellman, good afternoon, Your

8    Honor, for Mr. Saab.

9          THE COURT:  Ms. Kellman, good to hear from you.  All

10   right, sir, your attorney is on the phone, if you need to talk

11   to her privately at any point, we can arrange a phone call.  Do

12   you understand?

13         THE DEFENDANT:  Yes, sir.

14         THE COURT:  All right.  Let me go the Government.

15   What are we doing today?

16         MR. MAFFEI:  Your Honor, late, earlier in the --

17   actually it was late May, we filed a letter under seal with the

18   Court asking for a warrant of the defendant's arrest based upon

19   what the Government believes are violations of his conditions

20   of release, including as we set forth in that letter, new

21   criminal conduct involving a female victim, a mother of one of

22   his children.  I prior to today's proceeding, I did email a

23   copy of that letter, which had previously been ex parte and

24   under seal, to Ms. Kellman so she would have an opportunity to

25   review that before today.

4

1          The Government at this time, based upon what is set

2     forth in that letter, is asking for the Court to revoke this

3     defendant's bond as at that this point as we set forth in the

4     letter, we do believe the defendant, as we initially set forth

5     at the several initials appearances in this matter, before

6     various magistrate judges, and as was set forth in the original

7     Pretrial Services report, the defendant is a danger to the

8     community, and also a risk of flight.

9          Obviously this new information that we provided to

10    the Court I think highlights his dangerousness and that risk of

11    flight as well, in that he indicates that there's certain

12    things that will not stop him from, I believe that he

13    references his rage in a text message towards the female

14    victim.  As well as essentially what amounts to him withholding

15    from this woman her child in another country, forcing her to go

16    there and bring the child back to the United States.  Obviously

17    it's his child as well.

18          But I think the idea that this is someone who is

19    abiding by the conditions of release is clearly belied by his

20    conduct.  So at this point we're asking for him to be remanded

21    and a permanent order of detention pending trial.

22          THE COURT:  Ms. Kellman, what do you want to say?

23          MS. KELLMAN:  Good afternoon, Judge, how are you.

24          THE COURT:  I'm well, I hope you're well as well.

25    What are we going to do about this situation?

1          MS. KELLMAN:  Judge, I think that there's so many

2    different things flying in the air right now, and none of them

3    are really fair to my client.  Not the least of which is, I'm

4    learning about this minute by minute as the day goes on.  When

5    the day started, or a few hours ago, the Government told me

6    that my client had lied to Pretrial. That he said he went to

7    the hospital, that he wasn't at the hospital.  That the agents

8    were at his house. That he wouldn't answer the door.

9          And I since learned that my client notified Pretrial

10   this morning that he had terrible pain. Pretrial told him he

11   could go to the hospital.  And again, I have not confirmed any

12   of this, Judge. I mean this all is happening to me within the

13   last hour. And I'm doing the best I can to play catchup.

14         But the notion that -- I mean just something as

15   simple as, and it's not simple if it was true, but it's not,

16   that he held the child outside the country.  My understanding

17   is that there was an agreement between the husband the wife,

18   between my client and his wife, the mother of the child, that

19   the child would go to visit relatives out of the country.  I

20   don't have -- have not had a chance to put this paperwork

21   together.

22         The notion that he wasn't allowed to go to the

23   hospital is bogus. And in fact he even spoke with Pretrial, and

24   I'm sure Pretrial can confirm this, said that he was going to

25   need an MRI.  Pretrial told him that he couldn't do that with

1  his bracelets, that they would try to make arrangements so that

2  he would be able to have the MRI.  So the notion that he wasn't

3  at the hospital or didn't need medical care is not true.  The

4  notion that he wasn't in touch with Pretrial, is not true.

5       I understand that there's a notarized document with

6  respect to permission to take the child out of the country,

7  which is what started the proceedings in family court.  And if

8  the allegations about some kind of threats or whatever to the

9  wife are true, this has been going on for months. NYPD hasn't

10  taken any actions at all. But now the Government is going to

11  notify NYPD and ask them to take action.

12       The Government has wanted this fellow remanded from

13  day one. They were desperate to not have him out.  They're sure

14  he's going to flee.  He's been out for months and months and

15  months.  He hasn't fled.  They know where he was. When they

16  went to find him this morning he was home.  I even said to the

17  Assistant this morning, what do you mean you can't find him, he

18  has a bracelet on.  We don't know if he's still wearing the

19  bracelet.  Well he was home and he said the reason he didn't

20  answer the phone or the door was because they had given him

21  medicine in the hospital and that he was sleeping.

22       I think that to (indiscernible-unclear phone

23  connection) this out and to detain somebody on a record that

24  I've not had a chance to review and my client has been

25  (indiscernible) the indictment.  I can't even say that I'm

1  prepared to have him arraigned on that today.

2         What I'd ask Your Honor, to hold off on the remand.

3  He isn't well.  He hasn't had a chance to pick up the

4  medication that he was told to pick up.  He dropped the

5  prescriptions at CVS.  I'm told that his wife is going to pick

6  them up.  But he doesn't even have the medication that was

7  prescribed to him.

8         I understand that he may have given his discharge

9  papers to the, either the US Marshal or the agent. But again,

10 I've not spoken to my client.  So I'm just doing the best I can

11 with as little information as I have.  But I think to just try

12 to shove this down everybody's throat at the last minute, is

13 really an outrage.

14        I can't possibly be there this afternoon, and I

15 apologize for that, Judge.

16        THE COURT:  That's okay.

17        MS. KELLMAN:  I'm in court all day tomorrow in the

18 Eastern District.  And I would hate to have him be held in

19 custody because I'm not available.  I am happy to come out at

20 the Court's convenience on Wednesday, Thursday or Friday.  I

21 just can't be out there this afternoon.  The court will be

22 closed by the time I get there.  And I'm in court all day

23 tomorrow.  But the notion that -- they know where he is.  He

24 has a bracelet.  The notion that he can't just be in the house

25 until we see the Court, escapes me, Judge.

8

1          THE COURT:  All right, so Ms. Kellman, so I just

2     remember where we are.  I believe you came to me a while ago

3     and asked me to change certain circumstances about -- of

4     release based in part on religious practices by this defendant.

5     Am I remembering the right case?

6          MS. KELLMAN:  Yes, Judge, you are, and you granted

7     that request. And he followed the Court's order to the letter

8     of the law.  He didn't have any problem with it.  I made two

9     applications, Judge.  One was for the religious, the ability to

10    have dinner with, near his mosque so that he wouldn't have to

11    eat in his car, which was the Government's suggestion.  It was

12    a 5:30, if I remember, a 5:30 Ramadan service and an 8:30

13    Ramadan service.  And apparently the men in his community all

14    have dinner together in the intervening time.

15         And I asked the Government to consent to allow him to

16    go to restaurants and they would not do that, Pretrial, because

17    they didn't have the authority to do it.  And the Government

18    wouldn't consent. Your Honor agreed to let him do it.  He did

19    it without incident.

20         THE COURT:  Right, but --

21         MS. KELLMAN:  In addition to that there was an

22    application for change his, more broadly change his bail

23    conditions to eliminate the bracelet. And Your Honor denied

24    that request.

25         THE COURT:  Right.  I guess, I was just trying to

1  sort of focus on the situation. I've been sensitive to your

2  requests in the past.  But I guess my question is, when I'm

3  looking at a text from this defendant to the woman that's being

4  referred to as Victim 1 by the Government, where he writes, I

5  swear to Allah, and it's on page 6 of the letter, if my father

6  doesn't have the passports tonight both you will be making your

7  biggest mistake with me, and there's no coming back after it.

8  And if you think your family will help you and protect you from

9  my fucking rage, then you will regret it even more because you

10 getting them involved I'm my problem will only hurt them as

11 well.

12           Now, Ms. Kellman, you know the standard, you've been

13 practicing as long as I have.  How can I not find this to be a

14 potential risk to members of the community?

15           MS. KELLMAN:  Well, Your Honor, there is an order in

16 place, protective order in place.  He hasn't violated the

17 protective order, that I'm aware of.  And he has a bracelet on.

18 If Your Honor says he can't leave the house, then he can't

19 leave the house.  At least until Thursday -- Wednesday,

20 Thursday or Friday at Your Honor's convenience when I can at

21 least -- I mean I'm processing all of this in the last ten

22 minutes. The Government's letter, my client's wife is calling,

23 my client's son is calling.  You know, they say things like, he

24 says his children are -- his son is in, is out of the country,

25 his son is in college in Nassau County.  So there's a lot of

1 stuff flying around here that I think is just -- and their

2 complaints, their complaint about his, you know, angry words

3 towards his wife, you know, I don't have the context, I don't

4 know how it happened.  The words don't sound great. But nothing

5 has happened.  I mean nobody has hurt anybody.

6          And all I'm seeing is, I know that he was working at

7 a place adjacent to where his wife lived, his wife lived with

8 his child.  I've seen a video of the child waving and blowing

9 kisses to her father out the window, because he wasn't allowed

10 into the home.

11         And I also know that one of the complaints that she

12 made was that he had the child taken out of the country without

13 her consent.  And he produced a document that was notarized

14 with her signature on it, saying that he had permission to take

15 her out of the country.

16         So there's a lot of stuff going on here, and to take

17 his liberty away from him when I think that there are multiple,

18 multiple things in play, I think is very unfair.  Especially

19 when his lawyer hasn't had a chance to talk to him, hasn't had

20 a chance to get together the documents that would show at least

21 that he was in the hospital today.  That there is in fact a

22 notarized agreement, as I understand it, that says that he was

23 allowed to take the child out of the country. The child is back

24 in the country.

25         I don't know all the details and to remand him

1  without me having an opportunity to speak with him, I don't

2  know what the fire is.  And why this had to happen the way it

3  happened.  We started the day with me telling me that he said

4  he went to the hospital and that was a lie.

5      MR. MAFFEI:  No, Your Honor, if I may.  That's not

6  accurate.

7      THE COURT:  Well, hold on.

8      MS. KELLMAN:  It wasn't accurate, correct, it wasn't

9  accurate. It was a --

10      MR. MAFFEI:  No, no, I didn't --

11      MS. KELLMAN:  He was at the hospital, Pretrial knew

12  he was at the hospital.  I didn't know he was at the hospital.

13  But Pretrial knew.  Pretrial knew when he got there, Pretrial

14  knew when he left.  Pretrial knew when he got home.  He's not

15  - the Government is under the impression that any time he has

16  an opportunity he's going to run. He's been out for a year

17  practically and he hasn't run.

18      So I don't know why we have to keep going through

19  this drill.  He has family here.  You know, I've never been

20  married, Judge.  But I know that you know, over the years I've

21  heard many of my client have angry words with their spouses and

22  ex-spouses, especially when they're in the process of

23  separating. Which is why I don't do divorce work.

24      But I don't know what the record is right now.  And I

25  think for the Court to make a decision without hearing the full

1   story, I think is very unfair to this defendant, who is wearing

2   a bracelet.  He can just go home and sit still until I have an

3   opportunity to get up to speed and be able to address the

4   Court.

5         THE COURT:  Counsel, you had something?

6         MR. MAFFEI:  Yes, Your Honor. Just to correct a few

7   inaccuracies in what Ms. Kellman brought to the Court's

8   attention.  When I spoke to her earlier today I did not say

9   that the defendant lied about being in the hospital.  That's

10  completely inaccurate.

11        The factual scenario here is when the Court issued

12  the warrant week the Government notified Pretrial Services that

13  we were looking to arrest the defendant.  Pretrial Services

14  said we can arrange for him to appear here and the agents can

15  then take him into custody to avoid any potential conflicts.

16  And he already would be in the building.  And then we would

17  notify counsel at that time.

18        So the defendant knew that he was supposed to be here

19  this morning at 10 o'clock.  This morning, prior to that at

20  some point the defendant went to the hospital, and then told

21  Pretrial that he would not be showing up because he was going

22  to a doctor's appointment later in the day.  Ultimately the

23  Government and the agents discussed and we decided at this

24  point instead of waiting for the defendant to determine when he

25  wanted to come to court, they would go to the house and attempt

1  to make an arrest.

2  　　　　They were at the defendant's residence, no one was

3  answering the door.  But they knew from the location

4  information that the defendant was at the residence.  And then

5  at that point I contacted Ms. Kellman, explained the situation

6  to her and said, would she reach out to her client and let him

7  know that the agents were there looking to place him under

8  arrest pursuant to a warrant of this Court.

9  　　　　So just so it's clear, the Government never alleged

10  that the defendant lied about being at the hospital.  It was

11  that he knew he was supposed to be here and had elected not to

12  show up at 10 o'clock, whether it was for medical reasons or

13  not.  There was still an active warrant, the agents placed him

14  under arrest.

15  　　　　Now sort of the heart of the issue, just to go back

16  to a couple of things.  The defendant, the idea that he's on a

17  location monitoring and then the Court can be fine that

18  everything is okay, that's exactly why we're here, is because

19  that combination of conditions which the Magistrate Judge

20  originally released the defendant on, is clearly not sufficient

21  to protect the public, because he's making threats. These are

22  the exact kind of crimes that people commit while on location

23  monitoring.

24  　　　　And now Your Honor may say, well Mr. Maffei, the

25  defendant is in his house, how can be a threat to anyone.  Well

14

1  --

2          THE COURT:  Mr. Maffei, don't guess what I'm going to

3  ask you.

4          MR. MAFFEI:  I apologize.

5          THE COURT:  Just say -- go ahead.

6          MR. MAFFEI:  People may think that, not necessarily

7  Your Honor, but that may a question that some individuals would

8  have. Well the victim provided the Government with not only

9  copies of the text messages, but also Ring doorbell camera of

10  the defendant's son and another member of his family showing up

11  at her residence, after that order of protection was issued.

12          There was also contacts made on his behalf by those

13  individuals.  And these are just chronologically if you can see

14  at the bottom of this text, it's after there's a Det. Scrementi

15  (phonetic), that's actually a member of the NYPD, who the

16  Government spoke to, and he said he was looking to make a

17  probable cause arrest of the defendant if he encountered him or

18  if he was in Queens County or by the victim's residence. So I

19  don't know that there aren't NYPD charges coming.

20          But as, based on all the information available to the

21  Government, it was clear that the defendant was engaging in a

22  course of conduct to intimidate an individual via electronic

23  means, which is a crime under New York State Law, and it was at

24  that point when we determined that the defendant was

25  continually committing crimes while on release that we asked

1    the Court at this point to issue a warrant and remand him.

2          And there's nothing to indicate that there's any

3    other less restrictive means that's going to stop him from

4    doing these things.

5          THE COURT:  Okay, the defendant had his hand up.

6    We'll get to -- I'll get to you in a second.  The text that I

7    just read aloud from your letter, which is the May 24th letter

8    on page 6, when did that happen? What's the date of that text?

9          MR. MAFFEI:  That text was, it was certainly during

10   the pendency of while the defendant was on release.  It was -=-

11         THE COURT:  That's my concern.  Yes, I want to know

12   that, go ahead.

13         MR. MAFFEI:  I just need to find the exact date.

14   It's sometime after the original request for the order of

15   protection, which was in, I believe it was in April of 2023.

16         THE COURT:  So within the last month or so.

17         MR. MAFFEI:  And oh, I'm sorry, one other -- yes,

18   certainly, within the last two months for sure.

19         THE COURT:  Okay.

20         MR. MAFFEI:  Definitely the last month or so. The

21   other thing I also wanted to point out, the Government is never

22   alleging or claiming in this, nor has Victim 1 ever claimed

23   that the defendant's child and her child were taken out of the

24   country without her permission.  It's the opposite. That once

25   the child was out of the country, and as we sort of laid out in

1  the letter, the defendant started calling related to people --

2  calling people related to Victim 1's job, while she was at this

3  job training, it was when she returned from the training that

4  he refused to allow the child to come back. And Victim 1

5  herself flew to Columbia to retrieve the child. She's provided

6  plane tickets and information that corroborates that that

7  occurred to the Government, amongst those text messages.

8        But again, it's not that the child was taken without

9  permission, but that once out of the country the defendant

10  would not allow the child to be returned, and she had to go

11  retrieve the child herself.  When that wasn't their original

12  plan.  Obviously whether or not that arises to a crime versus a

13  family court matter, it's certainly within this course of

14  conduct I would submit as part of an ongoing crime.  But

15  whether it in and of itself, I don't know if I can say that.

16        THE COURT:  Right, so Ms. Kellman, I want to go to

17  you next.  Because there's something -- I want to make sure

18  we're absolutely fair to everyone here.  Your client has raised

19  his hand suggesting he wants to contribute something to the

20  conversation.  Now, I'm always reluctant to allow a defendant

21  to do that or, I mean he can say what he wants, but it

22  sometimes doesn't turn out well.  Would you rather speak to him

23  privately or handle this some other way?

24        MS. KELLMAN:  I would very much like to speak with

25  him before he speaks in court.

1          THE COURT:  Okay.

2          MS. KELLMAN:  Thank you, Judge.

3          THE COURT:  Okay.  I'm just trying to think how we

4   can do that.

5                    (Court and Clerk confer)

6          THE COURT:  You don't have your cell phone on your,

7   right, sir?

8          THE DEFENDANT:  I can use Matt's cell phone.  Used it

9   earlier.

10         THE COURT:  Which phone is that, sir?

11         THE DEFENDANT:  One of the agents here.

12         THE COURT:  Okay.  Is that okay?  Why don't you step

13  into one of the witness rooms right out here.  Back there, even

14  better.  Sorry.  Ms. Kellman, we're letting him step into a

15  different room so he can make a call to you.  And you can call

16  her and decide what you want to do.  All right?

17         MS. KELLMAN:  And Judge, do I hang up here and then

18  call back in?

19         THE COURT:  Yes, why don't you do that, sure.

20         MS. KELLMAN:  Okay, I'll do that, thank you, Judge.

21         THE COURT:  We'll wait.

22         MS. KELLMAN:  I appreciate that, thank you, Judge.

23              (Recording paused @ 3:09:39)

24              (Recording resumed @ 3:15:33)

25         MS. KELLMAN:  I did very much appreciate it, Your

18

1  Honor.  Your Honor, this goes back a little ways and I'd like

2  to just give the Court a little background that I know of. And

3  again this is not a full record because I've not had an

4  opportunity to really go through all the material that my

5  client has.

6          But I remember, and I can't say -- but a month or so

7  ago, my client reached out to me, his wife had gone to

8  Minneapolis for some job training, I think she works for Delta

9  Airlines, perhaps. And she had to go for a job training.  When

10 she was out there she got quite ill. And she phoned him and she

11 asked him to come out there. And he said I don't think I can go

12 to Minneapolis because I have a bracelet on.  And so he called

13 me and he asked if I could get permission for him to go. But I

14 didn't think that the Court would give him permission to go,

15 but that he should check with Pretrial.

16         As I understand, and I think that Ms. Suprimo

17 (phonetic) is in court, as I understand it, he reached out to

18 Pretrial and Pretrial told him what I would expect they would

19 say, which is talk to your lawyer. And this is something we

20 can't do without the Court's permission either.

21         At the end of the day, I spoke to my client and I

22 said this is the perfect opportunity to show that you abide by

23 the Court's rules and right now there is nothing that allows

24 you to go.  And his wife was convalescing, and so he agreed not

25 to go.

1      Now, when she went, he had agreed that because she
2   wanted to go and he couldn't take care of the child because he
3   was working, that they agreed that they would send the child to
4   family that he has in Columbia. And they also agreed that his
5   son would take the child down to Columbia and pick the child
6   up.

7      When his wife came back from Minnesota she was
8   feeling better and she was upset, very upset with him because
9   he called me by the day, by the hour, saying that she was
10  furious that he didn't go out to Minneapolis to help her when
11  she needed his help. And so she on her own went down to
12  Columbia to retrieve her son, the child, even though the child
13  was down there with her permission, and there was never an
14  allegation that the child was going to stay there.  In fact his
15  son had gone back down, which was the agreement, to bring the
16  child back.

17     When she got there the family down there was very
18  surprised. They called him and they said why is she here, she's
19  all upset and said I think there was a crossed wire. Just be
20  nice to her.  They apparently took her to dinner.  They invited
21  to spend the night. She spent the night and they all flew back
22  the next day together.

23     So are there angry words here, there are of course
24  angry words.   And there are threatening words.  And again,
25  I've never been married. I know that from the very short time I

20

1  did matrimonial work, people say really stupid things to each

2  other when they're upset.

3        The reality is, he's abided by Your Honor's rules.

4  His wife insisted that he come to Minneapolis.  I told him that

5  I thought it was ill-advised and did not ask Your Honor for

6  permission to do that.  He abided by my judgment in that

7  respect. He also spoke with Pretrial, which is what he should

8  have done.

9        He also reached out to Pretrial early this morning

10  and said he had terrible pains and he needed to go to the

11  hospital.  Pretrial knew that he was going to the hospital.

12  Pretrial knew when he came back.  I assume Ms. Suprimo will

13  confirm all of this.   He had no way of knowing he would have

14  been arrested if he went in this morning.  But he did say he

15  had pain. He went to the hospital. He said there needed to be a

16  follow-up.

17        I just think that there is, you know, a real concern

18  by the Government that he's going to flee. And there's been no

19  evidence of his intention to flee whatsoever.  He has been

20  abiding by the terms of his supervision.  He has reached out

21  every time he's had a question about it.  And when Pretrial

22  could deal with it, they dealt with it.  And when they couldn't

23  he reached out to me.

24        Pretrial has been very responsible about this, very

25  reasonable about it. And very firm.  I mean they've made it

1  clear to him what they can do, what they can't do.  And what he

2  can do and what he can't do.  And I don't think that Pretrial

3  would take a contrary view.

4          I know that I've spoken with Ms. Suprimo.  She's

5  expressed her concerns to me. And we've worked together so that

6  there isn't a problem.  And there hasn't been a problem.  And

7  could we have a hearing about whether or not the son was there

8  and what the son witnessed?  Yes.  If the woman took the stand,

9  could I ask her whether or not she was invited to dinner,

10 whether or not she spent the night, whether or not there was a

11 written agreement that he would -- that the child would go down

12 there so that she could go to her course, her training course

13 because he couldn't take care of the child while she was away,

14 because he was working.

15         There seems to be a number of very, very, very

16 reasonable explanations for all of this. And I don't know why

17 the remand comes when it does, and why the Government has in

18 every discussion I've had with them about his bracelet, they

19 are convinced that he's going to flee.  And yet he hasn't made

20 any attempt to flee. He hasn't done anything that he wasn't

21 supposed to do.

22         And you know, in my years of doing this, Judge,

23 sometimes defendants get squeezed like this because somebody

24 thinks they can cooperate and I don't know what the

25 Government's agenda is here.  But if their agenda is to make

1  sure that he appears in court and that ultimately resolves the

2  case, he's done everything that the Court has asked him to do

3  to resolve his -- you know, to follow the Court's directions

4  and he's talked to us repeatedly about how to resolve the case.

5  He's made it clear he doesn't intend to go to trial, we're

6  trying to work out a disposition with the Government.  If he

7  wanted to do that -- if he wanted to flee he wouldn't be doing

8  that.  He wouldn't be sitting with us for hour after hour.  And

9  going through discovery with us and making sure that we

10 understand all these different transactions, they're very

11 complex.

12        So I just don't see what the urgency is here.  I

13 don't see the immediacy. And I do say that when married couples

14 fight, they say stupid things, they do stupid things.  It

15 doesn't mean at the end of the day that anybody's in any kind

16 of harm. He hasn't violated the terms of the protective order.

17 I just think this is all premature.

18        And especially when he says -- and I don't know if

19 the Marshals or the agents have the discharge papers from the

20 hospital, but apparently there was, he tells me that there was

21 some follow-up that was required with an MRI.  And that they

22 gave him a prescription for medication which he dropped at CVS

23 but hasn't had an opportunity to collect the prescription.  I

24 don't know what's wrong with him, Judge, because I haven't had

25 that conversation with him yet. But to do this on the fly like

1  this, when the one thing we know is that he has abided by the

2  Court's instructions to be respectful of the Court and follow

3  the rules that are set by Pretrial, vis-a-vis his bracelet.

4  And he's done that, Judge.

5          THE COURT:  Okay.

6          MS. KELLMAN:  So I would ask that whatever -- the

7  status quo --

8          THE COURT:  Stay with me for one minute, Ms. Kellman.

9  I just want to go back to the Government for a second on this.

10  I remember the situation with the releasing home detention

11  application, and so forth. I just didn't really have it in a

12  time frame here.  It appears there's was an April 13th 2023

13  motion to eliminate home detention.  Fair?

14          MR. MAFFEI:  Yes.

15          THE COURT:  And according to your letter, a week

16  earlier you had this Victim 1 calling the police saying that

17  this defendant was outside her house banging on the door.

18  Fair?

19          MR. MAFFEI:  Chronologically, yes.

20          THE COURT:  If that's true, that would have been a

21  violation of home detention in addition?

22          MR. MAFFEI:  If he was --

23          THE COURT:  At her house banging on the door.  That's

24  not his house, that's her house.

25          MR. MAFFEI:  No --

1           THE COURT:  Right?

2           MR. MAFFEI:  Well, yes and no.  Here's why, Judge.

3           THE COURT:  Or is this the thing about the employment

4  being next to --

5           MR. MAFFEI:  Yes, it's the employment is literally --

6           THE COURT:  Well, all right, hang on a second. Even

7  if his place of employment was next door to her house, he

8  shouldn't have been at her house banging on the door, fair?

9           MR. MAFFEI:  Correct, and Your Honor --

10          THE COURT:  So Ms. Kellman, Ms. Kellman, when you

11  repeatedly assure me that this defendant has been following all

12  this Court's instructions, I'll get back to the notion whether

13  the text I read aloud earlier constitutes a flagrant violation

14  of everything that is the spirit of the order, but there's

15  actual physical violations here, right, I mean the Government

16  has documented instances where he wasn't where he was supposed

17  to be.  Am I wrong about that?

18          MS. KELLMAN:  I think that there's a little confusion

19  about that, Judge.  I've seen a picture of where he was

20  working. When they say he was next door, he wasn't in the

21  building across the street or down the street, he was working

22  in the empty yard that is, abuts the building that she's in.

23  You know, the daughter would wave to him when he was working in

24  that yard, in that area where they were building. It literally

25  was reaching distance.  It was, I'll describe it as a backyard

1  of that piece of property.  It's not like some other building

2  somewhere or down the street.  It's literally on the property.

3  He was working on the property. And I've seen videos of his

4  little daughter waving to him from that window while he was

5  down in the yard working.

6       So I think that it's not fair to say that he was not

7  obeying the order of the Court because in fact he was at work.

8  And he was waving at his daughter, you know, at his daughter at

9  the time.  And even if he was knocking on the door, he's still

10  at the same place.  I don't think you can separate where he

11  works with where his wife lives.  They appear to be the same,

12  from the photo I've seen, they appear to be the same piece of

13  property.  So I don't think it's that cut and dry, I really

14  don't.

15       THE COURT:  I mean that does seem the strangest

16  coincidence in history, right.

17       MS. KELLMAN:  That's why I asked to see a picture,

18  Judge, because I wanted to understand it.  And if I were able

19  to be there, with a picture, to show it to the Court, on

20  Wednesday or Thursday or Friday, perhaps Your Honor would

21  understand it. And I would ask that he be allowed to return

22  home so he can get whatever medication he needs, get whatever

23  MRI he needs. I don't know what's wrong with him.  And I don't

24  know that he knows yet.  Because he needs an MRI.

25       But it just seems to me that -- I can Your Honor's

1  concern.  If he was supposed to be at work and he wasn't at

2  work and he was near her house, but it's the same piece of

3  property. I don't understand it, but I've seen the pictures.

4  And I've seen the construction site that's right there. And

5  I've seen his daughter waving at him right from her bedroom --

6  well I don't know if it's her bedroom, but from a window just

7  above the site.  So it's not like he was acres away or yards

8  away, he was right there. That's where he was working.

9          How that comes about, I don't know.  Maybe I would

10 know if I spent a little more time with my client.  But today,

11 we haven't had any chance to talk other than me telling him

12 that the agents were outside and that he should go outside. And

13 he did.  Mr. Maffei had called me and said the agents are

14 outside your client's door.  I called the house.  He responded,

15 I tell him that they're outside.  He apologized, that he had

16 been sleeping.  He went outside and he --

17          THE COURT:  Okay. Mr. Maffei, you had something else?

18          MR. MAFFEI:  Well, a couple of things, Your Honor.

19 Just in regards to the premises, we never disputed. What Ms.

20 Kellman is saying is correct. They are adjacent.  What I think

21 is important here is that when the NYPD were first called there

22 on April 5th of this year, the victim reports that I've

23 obtained a family court order, I've tried to get him served, he

24 knows about it and he's hiding.  He's trying to avoid service.

25 So that's the reason the NYPD doesn't go and try and lock him

1  up that day.  His car is there.  But he's magically not there
2  at his job, where he went don't know.

3         What happens from there is that he goes back again
4  and again he has not yet been served, and again the NYPD are
5  called and he's banging on the door.  And that's on April 7th.
6  And again they're called and he's again -- but when they show
7  up he leaves.  This is someone who knows how to stay out of
8  trouble.  He knows he's breaking the law, he's avoiding the
9  consequences.

10        What ultimately happens is he sends his son and his
11 brother to her residence, once he's no longer employed there,
12 because I believe by March 31st he's not longer employed at
13 that location.  So now he's not actually going there for work.
14 He's going there for his own purposes. So then as Your Honor
15 pointed out, he may not be violating the order of protection,
16 but at that point on that April 5th encounter when he goes
17 there, he's violating the conditions of this Court's release,
18 in that he's not actually going there for work because he's
19 already been terminated by the employment.

20        But when he sends his brother and his son there, and
21 that's captured on Ring doorbell camera which is, is date
22 stamped for April 16th 2023 I believe is one of the ones where
23 the son is there, that is violations of the order of protection
24 by third party contact.  Going further than that there's text
25 messages that indicate -- from the son that's saying my father

1   knows about the order.

2            THE COURT:  Hang on, hang on. Third party contact

3   with Victim 1 is prohibited by his, the terms of his --

4            MR. MAFFEI:  I believe it is, yes.

5            THE DEFENDANT:  No, no.

6            MR. MAFFEI:  And if it's, and even if it's not, Your

7   Honor, the son texts, my father is aware of the order.  And now

8   he wants to get it -- he wants the stuff dropped.

9            And at the end of the day, it doesn't -- we're all

10  dancing around what the main point is. The main point here is,

11  he's threatening this woman over text, and Ms. Kellman hasn't

12  denied it at all that those texts were sent, minimize it as

13  heat of the moment. But the point is this is --

14           THE COURT:  Wait, wait, we're not all dancing around

15  the issue.

16           MR. MAFFEI:  No, I'm sorry.

17           THE COURT:  I read the text, right?

18           MR. MAFFEI:  I apologize, Your Honor.

19           THE COURT:  Okay.  Go ahead.

20           MR. MAFFEI:  I mean the arguments of counsel have not

21  addressed that that is the issue.  That is the real concern

22  here.  Right, if this was just a guy knocked on the door and

23  said, hey can I see my kid, we're not here.  But that's not

24  what he did.

25           THE COURT:  No.

1          MR. MAFFEI:  And that is dangerousness.  And the idea

2     that this isn't ripe for the Court, what, we should wait until

3     someone is hurt?  That's not realistic.  This is a violation of

4     New York State Law.  It's aggravated harassment, very clearly,

5     in violation of the statute.  His terms of release here, I'm

6     sure didn't allow him to commit future crimes. He's broken

7     that, blatantly. And he should be remanded.

8          And again this is a case in which the Government

9     initially sought release, that the Magistrate Judge setting

10    bond set an extremely high bond. And that was -- and the

11    electronic monitoring and that those were the least restrictive

12    means. And even under those conditions, this defendant has

13    still elected to break the law.

14          THE COURT:  All right, Ms. Kellman, anything else?

15          MS. KELLMAN:  You know, I would only say, Judge, that

16    there was -- and I certainly don't mean to minimize any kind of

17    angry language between these individuals. But all of this is

18    occasioned by the fact that this woman lied about the fact that

19    he had permission to send the child out of the country.  That

20    that was something they agreed upon so that she could go and do

21    her training.  So now the fact that -- and she went down there

22    of her own volition.  Nobody ever said that the child wasn't

23    coming back. In fact the son had gone there to bring the child

24    back.  She was treated well when she was there.  She was

25    furious at him for not coming out to Minneapolis.  And all of

1 this developed from that incident.

2        And his anger comes from her lying about the fact

3 that he had said that the child went there without permission.

4 Which is the first thing that she said.  And then that, then

5 when there are documents showed up that contradicted that

6 saying that he was never going to bring the child back. Also a

7 lie because he already sent his son to go get the child.

8        And that made for very bad feelings on both sides. He

9 was being lied about in a very, very harsh way.  And he

10 responded harshly, inappropriately and harshly.  But so did

11 she.  And she instigated this by being furious at him for -- I

12 mean he begged me, Judge, for two days, I'm begging you, he

13 said, please get permission for me to go to Minneapolis.  And I

14 was the one who said to him, I don't think it's something that

15 you have to ask the Court, that I would ask the Court about, I

16 think there are bigger issues here.  And we should save our,

17 you know, the need for carve outs in this incident and in the

18 order, in the bail order, for bigger incidents than this.

19 She's well now. And she had turned the corner whatever her

20 illness was, which is evident by the fact that she then

21 traveled on her own to Columbia.

22        But his fury, and it is fury, and I hear it, develops

23 from the fact that she lies to the authorities to get a

24 protective order, to say that he refused to bring -- because

25 she says he refused to bring the daughter back from Columbia.

31

1  And this just wasn't the case.

2           And it put him in a terrible legal position.  It put

3  him in a terrible emotional position.  And he acted poorly when

4  he spoke, but he didn't run away.  And he hasn't absconded.

5  And I think that what the Government is asking has everything

6  to do with their ultimate concern, which is that he's going to

7  flee, when there's no evidence whatsoever that he intends to

8  flee.

9           And this is just another tool in their arsenal of

10  ways to argue to Your Honor that it's their intention -- that

11  whatever it takes they're going to remand him because they

12  think he's going to flee, even though he's made no effort and

13  no attempt whatsoever to flee.

14           THE COURT:  Okay.

15           MS. KELLMAN:  I don't know what else I can say.

16           THE COURT:  All right, I've heard enough.  So, let me

17  just reset where we are here.  This defendant has been on

18  supervision for some time. There have been prior applications

19  to this Court about the terms and conditions of that, which

20  makes me somewhat more familiar with the matter.  But to begin

21  with, this of course is a presumption case, I'm right about

22  that, yes?  No?

23           MS. KELLMAN:  I don't think it's a presumption case.

24           MR. MAFFEI:  I don't --

25           THE COURT:  What's the underlying charge?

1            MR. MAFFEI:  What?

2            THE COURT:  What's the underlying charge?  I know

3  we're not talking about that today.

4            MR. MAFFEI:  The underlying charge is a disaster

5  relief fraud and wire fraud and money laundering.

6            THE COURT: My bad, my bad, sorry.  Okay. Forget that,

7  scratch that.  It is not a presumption case.  Doesn't really

8  matter because we are where we are.

9            There are risks of flight that the Government

10  identified.  In attempt to deal with that the Government set a

11  substantial bond and substantial conditions.  Here's the bottom

12  line. Ms. Kellman, I recognize it's a little unfair to you in

13  the sense that you're not here and so forth. So I'm going to

14  say that anything I say today you're free to move to

15  reconsider, I'll be here. You say you want to talk about this

16  in a couple of days.  That's fine.

17            But one thing that a defendant who is out on a

18  substantial bail package doesn't have the option to do, and

19  that's to be sending texts to people, directing the delivery of

20  travel documents.  My father should have those passports

21  tonight. Threaten, making threats.  And saying that nothing

22  will protect you from my fucking rage. That's what the text

23  says.  I can't do anything with that.  Someone on bail from

24  this Court cannot, cannot engage in such behavior.

25            Now, Ms. Kellman, you'd like to convince me there's a

33

1 larger context, you can't do that today, I understand that.

2 But I have no choice but to remand the defendant today. And if

3 you have more that you'd like to bring up with this, I mean

4 there are many, many concerning issues here that the Government

5 has raised.  Whether he still has his job, how in the world he

6 had a job that's right next to this woman's house who he used

7 to abuse and he's banging on the door.  There's lots and lots

8 and lots of problems.

9       But I have to tell you, the text sort of has me at

10 hello. I see both a risk to the community, risk of danger and a

11 risk of flight, based on what's before me today.  But as you

12 know, I don't prejudge anything. If you have more information,

13 more context you want to bring it to me in the next couple of

14 days, I'll be here. And we can put this back on.

15       So for now, I'm remanding the defendant.  And so

16 that's a remand pending trial.  But again, without prejudice to

17 Ms. Kellman coming forward with other information.

18       Anything else I can do for the parties today?

19       MR. MAFFEI:  No, Your Honor, I believe we previously

20 had scheduled a status conference for July -- sometime in July.

21 There is the outstanding superseding indictment if the defense

22 counsel -- we addressed it with her.  Ms. Kellman indicated she

23 would rather just do with that July date.  If this changes it

24 and they want to do it sooner, obviously that's something we

25 could discuss as well.

34

1          THE COURT:  Ms. Kellman?

2          MS. KELLMAN:  No, I think that day is appropriate for

3     the arraignment, that's fine with me, Your Honor.

4          THE COURT:  Okay.  All right, good. And Ms. Kellman

5     again --

6          MS. KELLMAN:  I do have one question, and that is, if

7     his family were to drive the medicines out -- well I don't know

8     where he's going to be housed actually.  But assuming then

9     he'll be at least in Central Islip for a short period of time.

10    Is it possible that his family on Long Island can bring the

11    medicine to the US Marshal. Again I don't even know what it is.

12         THE COURT:  I think -- I'm pretty sure, and the

13    Marshal can correct me if I'm wrong.  I think the answer to

14    that is no, am I right about that?

15         MARSHAL: If it's just antibiotics (indiscernible-out

16    of range of microphone) that's nothing unusual --

17         THE COURT:  Do you know what the medication is, Ms.

18    Kellman?

19         MS. KELLMAN:  I don't, maybe my client does.  I can

20    call his wife quickly and find out.

21         THE COURT:  What are you on?

22         THE DEFENDANT:  Antibiotics.

23         THE COURT: Antibiotics?  Okay, all right, do you know

24    which antibiotic you're on?

25         THE DEFENDANT:  (indiscernible)

1          THE COURT:  He has it.  Okay.  I'm going to tell the

2   Marshal to convey that information to the prison.  If you need

3   an order to follow-up, for them to look at that. But he should

4   get that as soon as possible.

5          MARSHAL:  (indiscernible)

6          THE COURT:  All right, good, anything else?

7          MS. KELLMAN:  Thank you.  No nothing.

8          THE COURT:  Ms. Kellman, if you have anything else to

9   file you know where to reach me.  All right?

10          MS. KELLMAN:  Yes, thank you very much, Judge.

11          THE COURT:  All right.  Have a great day, thank you.

12          MR. MAFFEI:  Thank you, Judge.

13                        * * * * *

14          **C E R T I F I C A T I O N**

15          I, **PATRICIA POOLE**, court approved transcriber,

16   certify that the foregoing is a correct transcript from the

17   official electronic sound recording of the proceedings in the

18   above-entitled matter.

19

20   /S/ PATRICIA POOLE

21   TRACY GRIBBEN TRANSCRIPTION, LLC       DATE: July 6, 2023

22

23

24

25