LAW OFFICES OF SUSAN G. KELLMAN
25 EIGHTH AVENUE • BROOKLYN, NEW YORK 11217
(718) 783-8200 • FAX (718) 783-8226 • SGK@KELLMANESQ.COM
FELLOW, AMERICAN COLLEGE OF TRIAL LAWYERS

March 8, 2024

Hon. Gary R. Brown
United States District Judge
Eastern District of New York
100 Federal Plaza
Central Islip, New York 11722

**Re:** **<u>U.S. v. Rami Saab</u>**
22-CR-344-GRB

Your Honor:

I write in advance of the upcoming sentence of my client, Rami Saab. Mr. Saab was arrested on June 29, 2022. He was released on bail on July 21, 2022. His bail was revoked on June 4, 2023, owing to an unrelated domestic incident. On July 14, 2023, he pleaded guilty to Count Three of a 25-count superseding indictment. Count Three charges that between May 1, 2020, and April 19, 2023, Mr. Saab and others conspired to defraud the Small Business Administration ("SBA") and several financial institutions administering the Paycheck Protection Program ("PPP) and Economic Injury Disaster Loans ("EIDL") programs of federal COVID-19 emergency relief funds meant for distressed small businesses, in violation of 18 U.S.C. § 1349.

Mr. Saab respectfully requests that the Court accept counsels' representations that he fully and unconditionally accepts responsibility for his conduct. Nothing in this memorandum is intended to detract from his earnest acceptance of responsibility or his unqualified remorse for his wrongdoing.

For the reasons outlined in this letter, we respectfully request that the Court grant a downward variance and sentence Mr. Saab to a below-Guidelines sentence so that he can continue the rehabilitative work he has begun while incarcerated and support his family.

## I. RAMI SAAB'S HISTORY AND CHARACTERISTICS

### A. Rami Saab's Childhood and Adolescence

Rami Saab was born on June 18, 1979, in Kuwait. He is the oldest of four children born to Muhammad Hasan and Aysha Saab. His brother, Ahmed Hasan, died at the age of 18, in 2000, after being shot in the head outside of a Queens nightclub. He has two living full siblings; Yasmine Hasan, who is 39 years old, and lives in Charlotte, North Carolina with her husband and 14-year-old son, where they own a restaurant, and Mostafa Hasan, who is 38 years old, and lives in Albany, New York, and works as a manager of a supermarket. Rami also has two paternal half siblings; Najieh Hasan (age 38) who lives in Charlotte, North Carolina, with her husband, who works as a chef, and their eight children, and [redacted] (age 9) who lives in Jordan with their father.

Throughout his early childhood, Rami moved back and forth between Jordan and Kuwait. His parents' primary home was in Kuwait, where his father was a partner in a wholesale clothing business. But every time Rami's parents fought, which sadly, was often, his mother would take the children and go back to Jordan to live with her family. Rami's father would then go to Jordan and try to fix things with Rami's mother. Following the inevitable reconciliation, they would move back to Kuwait. Rami recalls this happening between six and eight times.

From an early age, physical abuse at the hands of their father was the norm – rather than the exception – for Rami and his brother, Ahmed. As a young child, Rami recalls being punished by being locked in a room for hours without access to food, water, or toilet

facilities, or being tied to a window security gate so that he could not run away while his father beat him with a belt or a stick. Muhammad Hasan would beat his sons for a wide variety of infractions, which ranged from eating during a fast or making too much noise in the house. Sometimes he beat them for no apparent reason. Rami recalls that his mother was beaten when she tried to intervene. (See PSR ¶ 54.)

A neighbor of Rami's family in Jordan, Basema Hussein, writes about seeing the bruises from these beatings on Rami's body when he was a child. (*See* Letter from Basema Hussein, attached as Exhibit C.) And in her letter to your Honor, Rami's mother, Aysha Saab, reflects on her now-ex-husband's abuse. She writes that the beatings began a week into their marriage. She tried to leave him when she was pregnant with Rami, but her family would not allow it. (*See* Letter from Aysha Saab, attached as Exhibit B.) She recalls:

> Rami lived a very hard childhood, because his father is a violent man and, a very bad person. He used to beat me up maybe three times a week. Rami would start crying and my husband would start beating up the kids also. He never called me by name – only stupid, idiot, very bad words I cannot say. One time, my husband put my face in the burners on the stove, to try to force me to give him the money I had. The kids screamed and then he beat them up. Another time, he was going to hit me. Rami was 15, and went and grabbed his father's arm and said "I'm not going to allow you to hit my mom anymore." His father got so mad. He beat him so hard and he throw him out in the street.

(*See* Exhibit B.) Rami shared this incident, which happened after the family immigrated to the U.S., with counsel. He remembers taking the blows and not striking back, knowing that he would destroy their relationship permanently if he hit his father. When the beating was over, he remembers his father ordering him to leave the house immediately, without time to pack clothing or even get his bookbag for school the next day. And he remembers asking his brother Ahmed to slip out, at great personal risk, to meet him and hand him the

bookbag so that he wouldn't be unprepared at school – and get into even more trouble. Rami ended up sleeping at friend's house for two weeks until an uncle got involved and mended things with Rami's father, making it possible for Rami to return home.

The friend whom Rami stayed with was Bassim Ouachani, who has written a letter to your Honor. (See Letter from Bassim Ouachani, attached as Exhibit D.) In this letter, Mr. Ouachani writes about Rami's "unwavering resilience and determination in the face of adversity." (*Id*.) "Despite the hardships he faced," Mr. Ouachani writes, Rami "continued to demonstrate courage and perseverance, striving to overcome obstacles and build a better future." (*Id*.)

Rami's family immigrated to the United States when he was 14 years old. While Rami's mother, who spoke English, attended high school in the U.S., Rami, his siblings, and their father spoke only Arabic. Starting school in Queens, NY, at the age of 14 with no English, was another challenge for Rami and his brother. Rami's father took a job in a supermarket in Queens owned by his mother's brother as a floor manager. His mother was a homemaker. They lived in a two-bedroom apartment on 42nd Street and Astoria Boulevard in Astoria, Queens. Rami's parents slept in one bedroom; Rami and Ahmed slept in the other bedroom; and Yasmine and Mostafa slept on mattresses in the living room that were propped up against the wall during the day and lowered for their bedtime at night. Muhammad Hasan's propensity for violence was an ever-present threat that everyone in their home lived with and tiptoed around. On one occasion, the bruising on Rami's body was so noticeable that his teacher called the Administration for Children's Services ("ACS"). Rami lied to the ACS caseworker sent to the family's apartment, claiming that bruises were from fighting with his brother Ahmed, and the case was closed. As a child, he

never told anyone outside of the home about the abuse he suffered. (*See* PSR ¶ 54.) In her letter, Rami's sister, Yasmine Hasan also mentions the abuse that she, Rami, and their siblings suffered as children, writing that their father "used to hit us, specially Rami cus he was the oldest son." (Letter from Yasmine Hasan, attached as Exhibit E.)

**B. Young Adulthood and Early Contacts with the Criminal Justice System**

Rami attended William Cullen Bryant High School in Queens, attending ESL (English as a Second Language) classes for approximately one year, when he was expelled for not following the rules on a class trip. His 10th grade class went on a trip to Lake George. There was a sign that said "no swimming" but a bunch of students jumped in and the police were called. After his expulsion, he was transferred to a special education school in Flushing, Queens with other "troubled" kids where he was required to complete a six-month program in order to return to a mainstream school. After completing the program, he was transferred to Newtown High School in Queens. After one year at Newtown, he transferred to Long Island City High School, which was closer to his home. He received his high school diploma in 1997.

When Rami was 16 years old, and attending Long Island City High School, his father decided to move the family back to Jordan. His parents' intention had always been to live temporarily in the U.S. to make and save money, and at that point, Muhammad Hasan believed they had saved enough. Rami and his brother, Ahmed, begged their father to let them stay and finish school. As Rami writes in his letter to your Honor:

> When I was in the 11th grade, my parents decided to leave the U.S. and move back to Jordan. I was a foolish kid and didn't want to leave. My brother Ahmed who was in the 9th grade didn't want to leave either. We were crying and begging our dad to let us remain in the U.S. My mom was against it but my dad thought it would teach us responsibility and so he agreed

> to let us, at the age of 14 my brother and 16 me stayed alone in the U.S.

(Letter from Rami Saab, attached as Exhibit A.) Rami's mother, Aysha, did not want to leave her sons behind. She recalls:

> When Rami was like 15 or 16, we were all living in NY in Queens, and my husband decided to leave the 14 and 16 year old boys, Ahmed and Rami, to live alone in NY and we would go back to Jordan with our younger kids, Jasmine and Moustafa. I didn't want to go but he said don't worry about it. None of your business. Don't worry. And I'm sorry, but in our also religion and tradition is like the wife or the woman have no right to talk or to give her opinion or for the man to listen. And that was very, very bad. So I couldn't make any decision and I couldn't refuse anything. I was very, very scared from him. No matter what he says, I just do because I don't want to get beat up again and again and again. So we left the two boys all alone in an apartment in Queens. And when teenagers are alone, they could do anything. There is no parents, nobody there to advise to say, don't do this, don't do that. This is right, this is wrong.

(*See* Exhibit B.)

Alone in New York, with his 14-year-old brother to take care of, Rami was adrift. As he writes in his letter to your Honor:

> I went to school and I worked so that I can pay rent on the apartment and pay the bills and eventually a car. I thought I could do it all with part time jobs on the weekends. But when I couldn't afford it all, I got into the fast money life. The first crime I committed was I would buy fake $100 bills from this guy who sold them for $40. Then I bought credit cards #s and charged things to them that I would sell for cash. That was the beginning of more than two decades of stupidity.

(*See* Exhibit A.)

The rent on the Astoria apartment was $600 a month. Rami's landlord was his uncle, but notwithstanding his age and their familial relationship, he insisted that Rami was still obligated to pay. Rami worked various jobs after school; as a stock person and cashier at a

Genovese Pharmacy, and as a busboy at a restaurant. These jobs barely covered the rent on the apartment, and Rami began committing financial crimes to supplement his income; crimes like buying counterfeit currency and credit card numbers. He continued to attend school, hiding his parents' absence. When the school sent letters home, or calls were made to his home, Rami would make excuses, telling teachers and administrators that they had just stepped out, or were visiting relatives, or other excuses that came to mind. Sometimes, an older cousin pretended to be his guardian. When necessary, he forged his parents' names on school paperwork.

On May 25, 2000, at the age of 20, Rami was arrested after using a fraudulent credit card at a shop in the Roosevelt Field Mall in Garden City, New York to purchase $365.99 worth of clothing, and attempting to use the same fraudulent credit card to purchase clothing from a second store at the same mall. He pled guilty to Attempted Forgery in the Second and Third Degrees – a Class E Felony and a Class E Misdemeanor, respectively, and sentenced to a total of five years' probation. (PSR ¶¶ 34-35.)

### C. Ahmed's Death

After graduating from high school in 1997, Rami continued to support himself and his brother through petty crime. He and Ahmed continued to live alone in Queens, New York, where Ahmed attended William Cullen Bryant High School.

In the Summer of 1999 Rami met Adriana Moncada at a restaurant/bar where she worked in Queens. He was 20 and Adriana was 28. (See Letter from Adriana Moncada, attached as Exhibit F.)

On December 30, 2000, Rami and Ahmed went out to a local nightclub on Steinway Street in Queens with friends. Rami writes:

> The club was crowded and everyone was pushing everyone and fights broke out. The bouncers threw out these guys who had been trying to fight me and my brother all night, and they waited outside until we left the club. We tried to avoid them and crossed the street to the gas station where my car was parked and they took out guns and started shooting. Ahmed was hit in the head and he died in my arms. He was 18 years old.

(*See* Exhibit A.) Ahmed , then a senior in high school, never graduated.[1]

In connection with this incident, Rami was charged with possession of weapon and reckless endangerment. (PSR ¶¶ 34-35.) According to Probation, Rami's prior federal PSR alleges that he "displayed a handgun and fired several shots at a vehicle." (PSR ¶ 45.) Rami disputes that he possessed, displayed, or fired a gun in connection with this incident – an unproven allegation made by the group who murdered his brother as justification for their actions. Significantly, the charges were dismissed.

Ahmed's death shattered Rami. He writes:

> At that point with all the misery and sadness I had felt. I also knew I had failed my younger brother. I failed protecting him and being responsible to him. I failed my parents and my family in letting my brother get killed in my presence which led me to believe now I have to prove myself, that I owe it for the rest of my life to my family that I should provide and protect them.

(*See* Exhibit A.)

[1] For news reports of Ahmed's murder, *see* Sorkin, Peter, QNS.com, "18-year-old killed near nightclub," January 4, 2001, available at https://qns.com/2001/01/18-year-old-killed-near-nightclub/ and Parascandola, Rocco, "Apple Slay Stats Rise as Top Cop Demotes 3," December 31, 2000, available at https://nypost.com/2000/12/31/apple-slay-stats-rise-as-top-cop-demotes-3/

Rami's mother, Aysha, was staying with her sons in Queens at the time, after receiving hard-won permission from her husband to travel back to the United States to spend Ramadan with her boys. She recalls the effect of Ahmed's murder on her older son:

> You won't believe what that did to Rami. He went crazy. I'm the mother, but he was angry and screaming and crying…Rami wasn't the same after that.

(*See* Exhibit B.) Aysha brought Ahmed's body back to Jordan for funeral services and burial. Because Rami was out on bail for the later-dismissed gun charge, he was prohibited from traveling to Jordan with her. He was required to remain in New York, and never forgave himself for failing to protect his brother and for not attending his funeral.

Rami and Adriana married in a religious ceremony on January 16, 2001, and Adriana moved into the apartment Rami had previously shared with his brother, Ahmed. Although Rami knew that Adriana was from Colombia, he was unaware of her immigration status. In 2002, she was deported back to Colombia.

### D. A Vicious Cycle Begins

At twenty-one years old and without any family in New York other than his new wife, Adriana, Rami was adrift. In 2001, he became involved in a scheme where higher-ups were creating fake companies and leasing computer equipment that they would then turn around and sell for a profit. Rami's role in the scheme was that of a "fence" – it was his job to sell the computers, and he received a commission for arranging the sales.[2]

---

[2] As addressed in our PSR objections, paragraph 37 of the PSR states that Rami was arrested on August 24, 2001, for his participation in this scheme and released on bail, but this is inaccurate – as detailed below, Rami he was arrested in Colombia in March of 2003 on these charges and brought back to the U.S. for his arraignment on them.

In November of 2002, Adriana was deported back to Colombia. Without Adriana, New York became a very hard place for Rami to live. Not only had he lost his brother and his wife, but after the attacks of September 11, 2001, Islam had become synonymous with terrorism for many Americans. Rami was already depressed because of his brother's death. The loss of his wife left him all alone. Sadly, he continued to support himself through crime.

Although Rami was prohibited from traveling abroad while out on bail; however, he left the country, first traveling to Jordan to visit with his family, and then, he followed Adriana to Colombia, where she was living with her family. And again, he found himself in an environment where he didn't speak the language. In 2003, Adriana became pregnant with their son, Adam. Unfortunately, Adam was born after Rami was returned to the U.S. and imprisoned, as described in further detail below.

In March of 2003, at the age twenty-three, Rami was arrested in Colombia and extradited to the U.S. He was brought into the country through Miami, Florida , and ultimately transferred to New York to face charges in the computer leasing scheme, as well as the open warrant stemming from the earlier-described, later-dismissed gun case.[3] These cases were resolved when Rami pleading guilty to Second Degree Bail Jumping (a Class E Felony) in connection with the gun case, and Attempted Enterprise Corruption (a Class C Felony) in the computer theft case. (PSR ¶¶ 36-37.) He was sentenced to four to eight years in prison and ended up serving five and a half years.

For Rami, prison was lonely, humiliating, and shameful – and forced him to relive much of his childhood trauma. Over the course of his five-and-half-year incarceration, he

[3] As addressed in our PSR objections, paragraph 46 of the PSR lists the date of Rami's appearance in the Miami court as 4/25/2003, but this is wrong – he was arrested in Colombia in March of 2003 and brought to Miami shortly thereafter.

incurred six disciplinary infractions, most of them minor. On January 25, 2006, he was charged with Promotion of Contraband to Prisoners in the Second Degree, a Class A Misdemeanor, and had an additional 89-days tacked onto his sentence. The case arose after corrections officers searched Rami's cell and found a hidden cellular telephone. (PSR ¶ 38.)

In 2005, while Rami was incarcerated, his parents divorced, and Rami felt free enough to distance himself from his father. As an act of his newfound independence, Rami took his mother's last name. From that moment forward, he has been known as Rami Saab.

Rami was released to parole in 2008 and returned to New York, where he worked briefly at his uncle's supermarket before getting a job with a flooring company, where he worked from November 2008 and September 2009. After Rami's release, his son Adam flew to New York from Colombia as an unaccompanied minor to live with him in Queens, where he attended the local kindergarten. After Adam's kindergarten year, Rami brought his son back to Adriana in Colombia, where Adam attended the first grade.

The PSR states Rami's parole was revoked on December 9, 2009 "due to a new arrest, and he was sentenced to four months of custody." (PSR ¶ 37.) As addressed in our objections to the PSR, this characterization is inaccurate; Rami's parole was revoked after he traveled to Colombia to return his son to Adriana without the permission of his parole officer. He was released on March 2, 2010. (*Id.*)

After his release in March of 2010, Rami went to live with his mother and brother, Mostafa Hasan, and Mostafa's wife and kids in Jonesboro, Arkansas, where his family had settled, after his mother's divorce. The family owned and operated a gas station and store called "Downtown Express Mini Mart." Rami's family made him a co-owner of the gas

station and he started working there alongside them, becoming manager of operations. He successfully transferred his parole to Arkansas and was discharged from parole on April 8, 2011.

In 2011, Adriana moved to Jordan and took Adam with her, where they lived for Adam's second and third grade years. Rami traveled back and forth from the U.S. to Jordan every two or three months to visit Adam and Adriana, who learned Arabic while they were there.

In 2011, Rami met Rosa Cepeda when visiting New York, and they began a romantic relationship. Rosa moved with Rami and her two daughters, Arianna and Alicia, ages 11 and 8, to Jonesboro. On September 7, 2012, Rami was arrested, and ultimately pleaded guilty to "Aiding and Abetting the Possession of Pseudoephedrine" in violation of 21 U.S.C. § 846 in the Federal District Court for the Eastern District of Arkansas. As Rami writes,

> In 2012, I was arrested for selling Sudafed out of the gas station. It was such a stupid move, totally not worth it, nor anything should have been worth it. I had a place to work but I needed more. I gambled with my life and lost – again! I spent another four and a half years in prison.

(*See* Exhibit A.)

In February of 2018, Rami was released to a halfway house in Little Rock, Arkansas, , where he lived for one month before finding his own apartment there. Adam came to live with him during the summer of 2017. Rami was released from halfway house status on August 11, 2017, and he and Adam moved to New York to live with Rosa in Long Island, where Adam attended high school for one year, before returning to Colombia. At the time, Adam spoke Spanish and Arabic, but not English, which he learned in school. Rosa gave

birth to the couple's first child, [redacted], a son, on November 7, 2018. Their second son, [redacted], was born on June 3, 2022.

Sadly, [redacted] (PSR ¶ 57.) Probation further writes:

[redacted]

(PSR ¶ 57.) Similarly, Rosa Cepeda writes:

[redacted]

(Letter from Rosa Cepeda, attached as Exhibit G.)

From September of 2017 until June of 2019, Rami worked as a delivery person for Big Boss Furniture and Mattress, in Glen Cove, New York, a company owned by Rosa's brother-in-law, earning $100/day. His employment with Big Boss ended when the business closed.[5]

---

[4] [redacted]

[5] While Paragraph 73 of the PSR states that "an internet search of this company was conducted, which revealed that it is still operating", this is inaccurate. While the business still has a web presence on Google, this presence is an artifact. As addressed in our PSR

After leaving Big Boss, Mr. Saab worked "off the books" in construction on a number of construction sites until COVID-19 effectively ended these jobs.

In December of 2018, Rami began a romantic relationship with Estefania Llorens Sanchez, with whom he shares a daughter, [redacted], who was born on [redacted] and is now four years old. In March of 2023, after his arrest in this case, Rami's relationship with Estefania fractured. Some of the details, including a March 30, 2023, order of protection ordered by the Queens County Family Court, are included in paragraphs 2 and 3 of the PSR, and was a factor in the government's decision to move for the revocation of Rami's bail, which was revoked after a hearing on June 5, 2023.

On November 2, 2023, Estefania withdrew her family court petition, which was dismissed without prejudice. (*See* Family Court Dismissal, attached as Exhibit Y.) Estefania and [redacted] are currently living in Kentucky where Estefania works as a flight attendant for Endeavor Air, a subsidiary of Delta Air Lines.

While out on bail in this case, Rami worked in construction for Pedrol Construction, Inc. (Mr. Saab's W2 forms for his work for Pedrol are attached as Exhibit Y.)

Prior to the revocation of his bail, Mr. Saab spent almost one year, from July 21, 2022, until June 5, 2023, under strict bail conditions which included home confinement enforced by electronic monitoring. While the time spent by a defendant on home confinement with electronic monitoring as part of his bail conditions does not qualify as "official detention," and he is not entitled to credit toward his federal sentence for that time, *see Reno v. Koray*, 515 U.S. 50 (1995); *see also Cucciniello v. Keller*, 137 F.3d 721, 722–

---

objections, the physical location of the business has been shuttered.

23 (2d Cir.1998), we nonetheless ask your Honor exercise your discretion and include this period in your sentencing calculation, as you are permitted to do under 18 U.S.C. § 3553(a).

**E. The Offense Conduct**

Rami Saab pleaded guilty to Count Three of a 25-count indictment, charging him with conspiring with others to conspiring "to defraud the Small Business Administration (SBA) and several financial institutions administering the Paycheck Protection Program (PPP) and Economic Injury Disaster Loans (EIDL) programs of federal COVID-19 emergency relief funds meant for distressed small businesses, and to obtain money and property from the SBA and the financial institutions" (PSR ¶ 1.)

Mr. Saab participated in the conspiracy between May 1, 2020, and his arrest on June 29, 2022.

**F. Acceptance of Responsibility**

Mr. Saab is deeply ashamed of, and regretful for, his criminal conduct. As he writes in his letter to your Honor:

> I am very regretful for my actions. I made bad choices that are going to cause me to miss out on God knows how many years of my young kids lives. And I made this mistake before with my older son, Adam. It just kills me and makes me more ashamed than I can put into words.
>
> When I think about what led me here, I know that greed was a part of it. Maybe the biggest part of it. It was also pride. I am a person who has always liked to look good in the eyes of other people and sometimes that meant "getting over" on them. To be the smart one. But to also be the one who other people can count on to help them.

(Letter from Rami Saab, attached as Exhibit A. )

Mr. Saab also takes full responsibility for his criminal conduct. He writes:

> I have made bad decisions and used bad judgment. Something I have done my entire life. When I was young I needed guidance but I didn't have it so I did the wrong thing. This is not an excuse, but once I fell into this trap, I kept getting myself trapped in the criminal system and I have no one to blame but myself. Each time I leave prison I vow that I'm never coming back – that this is it, this is the end. And then something happens – I get tempted I take a risk, knowing I could end up back in here. And eventually I do end up back in here.

(Ex. A)

### G. Efforts at Rehabilitation

Mr. Saab recognizes that he must spend the rest of his life making up for the wrong he has done – and that he owes this to his loved ones and to society. While he may never be able to fully repay this debt, he intends to continue to try. He also understands that, given his history, your Honor has no reason to believe that he will get things right this time. He is determined to earn the trust of the Court, the government, and his family through his actions, which he knows will be no small feat. To this end, he has begun doing what he can, despite being incarcerated, to begin to set things right.

First, in order to begin to repay the $9,668,508 in actual monetary loss suffered by the programs he conspired to defraud, he has put together all of the funds he is able to garner from behind bars, and transferred those funds to an attorney escrow account so that it can be applied to begin to offset some of the loss resulting from his wrongdoing. To date, approximately $160,000 has been deposited with the court towards the restitution total. In order to raise the funds to make this payment, Mr. Rami sold a property that he owned in Turkey for $125,000, and a car he owned in the United States for $32,565, and arranged for all other funds under his control to be transferred to the escrow account. (*See* Records of Sales, attached as Exhibit Z.)

In addition to making monetary payments to offset the loss total, Mr. Saab has agreed to sell two other properties he owns and surrender the proceeds to pay restitution, or convey title for these properties to the government.[6] The properties Mr. Saab owns, both of which are in Jonesboro, Arkansas are: a home at 513 West Thomas Avenue, with a 2022 assessed value of $313,000, and an empty plot of land he owns at 1115 Cottonbelt Avenue, with assessed value of $29,000. (*See* Redfin Valuation Estimates, attached as Exhibit AA.)

While the $195,000 in cash and $342,000 in property are a drop in the bucket, representing just over five percent of the actual loss his actions caused, it is a first step, and a demonstration of his commitment to repay the total in full. Mr. Saab will continue to use his best efforts to collect additional funds to repay his debt.

In addition to repaying whatever he can, Mr. Saab has worked to repair his relationships with family – relationships that have been damaged by his criminal conduct and the consequences of that conduct.

As Adam Hasan, Mr. Saab's son, writes,

> I want you to know you are looking at someone who has made mistakes in his life. He's learning from them. He's really trying. He wants to be better than he was before. He wants to take care of his responsibilities. He wants to be there for his younger kids and for me. He's changed a lot. I know what he was like before and I know what he's like now. He's changed a lot and he's still changing. Everyone in his family already sees a different person. He's grown and matured. And he's a positive influence in my life, telling me not to do illegal things, not to take short cuts in life, to respect the law and respect officers, to li[v]e a nice life, and not to do anything you can't be proud of. He has always told me that I was smart and I could do things the right way in life and his support has given me the confidence to believe in myself and work hard for my dreams. I know he has done things he's not proud of and I am not proud

[6] Counsel has been in communication with the government about the best way to transfer these properties or their value for the purposes of restitution and is awaiting a response.

> of him for the illegal things he has done but I hope this letter shows you the many reasons I am proud to be my father's son.

(Letter from Adam Hasan, attached as Exhibit H.)

Similarly, Rosa Cepeda, the mother of Rami's two young sons, who remains in a long-term domestic partnership with him, writes about the change she has observed in him since his incarceration:

> I have spent many hours visiting with Rami in jail. He regrets decision after decision. He always mentions that. He knows his actions have cost him the ability to be present father for his kids and to watch them grow up. I ask you to show him leniency and something to look forward to, a day that is not too many years away when he can come back to us and prove that he can make better choices going forward.

(Letter from Rosa Cepeda, attached as Exhibit G.)

Further, Adriana Moncada, the mother of Rami's son Adam, with whom he maintains a strong friendship and partnership in raising their child, writes:

> I know that Rami has pleaded guilty to serious crimes and that there must be consequences for his actions. I can't defend what he did and I admit I [am] angry with him for hurting our family in this way, most of all for hurting our son. But I want you, Honorable Judge, to know that there is more to Rami than this case, Rami has been a positive part of my life, he's a person who has done wrong and has always shown himself [as] willing to change, lead and grow.

(Letter from Adriana Moncada, attached as Exhibit F.)

Despite the difficulties in their relationship, and the ways in which Rami has failed her as a partner and co-parent at the end of their romantic relationship, Estefania Llorens writes about how she and Rami have moved past their prior issues, and are committed to working together to co-parent their daughter:

> In the past, we have had our problems. I requested an order protection against him. Our problems happened because of

> differences in religious beliefs and parenting styles. Some of this was a misunderstanding and some of it was not. The case in the family court is now finished. We agreed that we will work together in order to raise our daughter in a peaceful, safe and caring environment. We will also share the responsibilities and duties that come with raising a child. Since then, we have spoken a lot and I have forgiven him. With all of his faults, and he has many, he is a warm and loving father, a good provider and our daughter misses him terribly.

(Letter from Estefania Llorens, attached as Exhibit I.) While Rami was incarcerated at Yaphank Correctional Facility, Ms. Llorens brought [redacted] to visit him five times. During these visits, they worked on repairing their relationship and working together to make a better life for their daughter.[7]

In summary, Rami Saab is doing everything he can to working to prove to himself, his family, his community, and this Court that he can and will make different choices with his life going forward. Asked by counsel why he should be believed after so many missteps his reply sounded in his love for his family and not wanting his children to feel the kind of emptiness that he experienced as a child.

### H. Mr. Saab's Commitment to Family, Community and Society

While Rami has had a most difficult past, and has frequently run afoul of the law, he has throughout his life, demonstrated a strong commitment to family and community. As the eldest son in his family, Rami feels a great sense of responsibility to take care of others. As he writes in his letter to your Honor:

> I am an eldest son, and in our culture, responsibility always falls on the eldest. I am supposed to make sure everyone is ok. Any emergency falls on me. I was honored and proud to take care of my parents, my siblings, the mothers of my children

[7] In January, Rami was transferred to MDC Brooklyn. He has not received any visitors at MDC, and is waiting for approval of his visitor list.

> and their parents. But at the same time, I dishonored myself and my family by doing so, which is doing it through unlawful means. I am struggling with this now, thinking about my actions, what I did wrong, and what I will have to do differently going forward.

(Letter from Rami Saab, attached as Exhibit A.)

This sense of responsibility extends beyond Rami's immediate family. As Rami's friend, Shahid Hassan writes,

> Rami is an integral member of my family. My kids rely on his sensible and wise advice. He gets along very well with our family members, from the eldest to the very youngest, especially my two young boys. Rami shows respects and appreciation for those in his life, especially his parents. They rely on him for almost everything and he provides without thinking twice.

(Letter from Shahid Hassan, attached as Exhibit J.)

Neveen Mohammed,  writes about meeting Rami 15 years ago when she was a divorced mother of two young daughters and struggling financially, and how "Rami used to help me when he could." (Letter from Neveen Mohammed, attached as Exhibit K.) Ms. Mohammed writes about an abusive second marriage to an Argentinian man, and how she got stuck in Argentina dealing with custody issues around the couple's young son after that marriage ended. She writes:

> Throughout this time, Rami supported me. He sent me money every month during the years I was stuck there, and when a judge finally gave me the authority to leave Argentina with my son and return to Jordan, Rami bought our tickets home. It took five years for me to get back to my girls. When I left them they were 10 and 12 years old, when I returned they were 15 and 17. We lost so much time but without Rami's help I don't know if I would  have made it back to them.

(Ex K.)

Similarly, Hala Sadeq Fayeq, a neighbor of Rami's family in Jordan, writes about growing up an orphan, and how Rami has helped support her since childhood. She writes:

> He often sent me my allowance and some of my study expenses, and on occasions and holidays. He still sends me personal allowances to this day. He helped me with the cost of surgery two years ago, as I was suffering from excessive obesity due to problems. He sent me the money for the operation and I had it done and it saved me from more health problems. Even though I am an orphan and single until now and have no job or breadwinner, he was my support and helper I am indebted to this person for the rest of my life. My family and I love him very much. He is generous and generous, and he is a blessing to all of us.

(Letter from Hala Sadeq Fayeq, attached as Exhibit L.) And Ramzia Abdel Qader Abu Shanab, another neighbor, writes about how Rami has provided financial support to her family over the years. (Letter from Ramzia Abdel Qader Abu Shanab, attached as Exhibit M.)

Further. Rami Mesbah writes about getting to know Rami Saab through a group of common friends. Having seen Rami "in different business and social settings," he writes that [o]ne thing that is consistent is his respect for others." (Letter from Rami Mesbah, attached as Exhibit N.) Mr. Mesbah further writes that Rami "stretches himself in many directions for different people, especially his parents", and that he is a "good man" who "sees the good in others and gives back just that." (*Id.*) Similarly, friends Ali Shuaib, Abdelsalam Mali, George Tsiropolous, Tomasz Krasowski, and Yahia Taha, write about Rami's commitment to friends and family. (Exhibits O-S.)

Still others write about Rami's commitment to lifting up impoverished communities around the world. Ali Shuaib writes that Rami "even cares for deprived kids overseas that he does not know, such that when I visited Ghana in 2018, he donated to build a well for

the children at a school there so they can have access to clean water." (Letter from Ali Shuaib, attached as Exhibit O) Payolba Yameogo, a friend of Rami's from Burkina Faso, writes about how Rami "actively contributed to building several schools and mosques and water wells" in the country. (Letter from Payolba Yameogo, attached as Exhibit T.)

A letter from the Al -Yaqeen Foundation for Drilling and Well Services attests that between Rami's release from prison in 2017 and 2021, he "contributed to the establishment of 53 water wells in Nepal, India, Pakistan, Bangladesh and Uyghur camps." (Letter from the Al -Yaqeen Foundation for Drilling and Well Services, attached as Exhibit U.) And three letters from the Administrative Committee and General Committee at the Othman Bin Affan Center in the Al Hussein District of Jordan from 2019, 2020, and 2021 attest to his donations which permitted the Center to purchase "Eid clothes" and "meat and pantry items" for needy families. (See Letters from Othman Bin Affan Center attached as Exhibit V.)

**I. Mr. Saab's Future Plans**

Rami Saab recognizes that he was living a double, if not triple life. He has been a devoted father to his children, and a terrible partner to the mothers of his children. He has been a committed friend and community member, providing emotional and financial support to people in his life, and to children and impoverished communities to which he has no direct connection. And he has helped to defraud U.S. government programs of millions of dollars that were intended to save small businesses left struggling during the COVID-19 pandemic, and has spent decades of his life cycling in and out of prison as a result of his participation in a host of criminal schemes. He writes:

> I understand better than anyone that I need to end this cycle that has kept me from being the kind of Dad and the kind of

person I know that I can be. I know that I can't do it on my own. I know I need help. I have tried speaking to the mental health staff here at the facility. It helps to talk things through and to say things out loud. It give me relief and clarity, but in between the sessions it is very hard for me to take. The pressure builds up again and I am overcome by the weight of my actions and the awareness that I have hurt so many people who count on me and the first of those people are my babies who can never understand why their dad isn't around. I realize that I am here because I put myself here. It's like I am trapped between two worlds. Part of me is here mentally – but part of me is out there, trying to solve problems for the people I love.

Oddly, I think that talking to my lawyers has been helpful. They have been pretty tough on me "I believe"…no excuse is good enough for them. I am committed to regular therapy to help me speak honestly about what I've done and to help me work on the tools I need to change the shameful patterns of my life. I know I need to make my future all about my kids, instead of using them as an excuse to commit crimes. I am 44 years old and there is no time to waste anymore. I also need to work on my religious commitment. I am a devoted Muslim but I have not fulfilled what my religion asks of me.

I would like to go back to school and study journalism and get a college degree. I would also like to move to a Muslim country where my parents are now "Jordan." Of course with agreement with my children's mom. I will get a job in journalism. I speak three languages: English, Arabic and Spanish, and I think I could be useful in helping gather information and doing reporting so that important stories can be told. I would be very proud to do this.

Rather than getting over on people, I would be doing a service. There is no time to waste – I have wasted enough of it. My plan is to start my college education from behind bars.

The real question is – why should your Honor believe a word I say? Good question! One answer is that while I have been incarcerated, I have asked my attorneys to set up an escrow account so that I can begin to gather some of the money that I took as a part of this crime. Not all of the money is within my reach but I am making every effort to collect as much as I can and return it to the government. Also if you can recall I forfeited the cash part of my bail in your courtroom as well.

> I am also thinking about how my actions effect the community. At the time, I didn't think about consequences. I rationalized that everyone was doing what I was doing. Now I can see the harms of crimes like this one – in the short term, taking money that should have gone to legitimate businesses to keep them from failing. In the long term, helping the country's economy. And in general, I know what I did chips away at nationwide trust. Committing this crime may make it more difficult in the future for businesses to get the help they need. Even if I am able to repay all of the money I took, I know I helped break things that I may never be able to fix.
>
> I would very much like a fresh start for myself and for my kids and their mothers. I think therapy, commitment to my religion, and education will help me find my path. I can't believe it took me so long to get to this place, but I thank God that I am finally here.
>
> All I can do is wake up each day and re-commit myself to an honorable life. And I know the only way to prove myself is to live it.

(Letter from Rami Saab, attached as Exhibit A.)

## II. CALCULATION OF THE GUIDELINES

In the plea agreement between the parties, the government provided the following estimated guidelines calculation, to which Mr. Saab was required to stipulate:

| | |
|---|---|
| Base Offense Level (U.S.S.G. §2B1.1(a)(1)) | 7 |
| Plus: Loss btw. $3.5 M & $9.5 M (U.S.S.G. §2B1.1(b)(1)(J)) | +18 |
| Plus: Disaster Relief Fraud (U.S.S.G. § 2B1.1(b)(12)) | +2 |
| Plus: Organizer/Leader of Any Criminal Activity (U.S.S.G. § 3B1.1(c)) | +2 |
| Acceptance of Responsibility | - 3 |
| **Total:** | **26** |

For the purposes of these Guidelines calculations, Mr. Saab was also required to stipulate to a loss amount of 9.5 million dollars. Assuming that Mr. Saab Criminal History Category III, this level carries a range of imprisonment of 78 to 97 months.

As addressed in our objections to the PSR, Probation came up with an erroneous – and much higher – Guidelines calculation, based on its calculation of an intended loss

amount of $32,957,181, which increased the total offense level to 32. (PSR ¶¶ 20-32.) Probation explained its calculation of this sum as follows:

> In total, over the time frame of the instant offense, as a result of this fraudulent scheme, the defendant and CC-1 conspired to submit multiple loan applications in relation to PPP and EIDL programs totaling an intended loss of $32,957,181.

(PSR ¶ 13.) With an adjusted offense level of 32, and a Criminal History Category of III, Probation calculated Mr. Saab's guidelines range as 151-188 months' imprisonment. (PSR ¶ 84.)

In order to arrive at this astronomical number, Probation has counted all of the incomplete and rejected applications made for each business. This is distortion of the concept of intended loss; while multiple applications may have been attempted on behalf of number of the companies, these multiple applications were efforts to secure a single loan (either EIDL or PPP), and not multiple loans. While it was possible for a single business to obtain both an EIDL and a PPP loan, it was not possible for that business to apply for multiple such loans.

With respect to EIDL loans, small businesses have never been permitted to apply for more than one loan.[8] With respect to PPP loans, it is true that the Small Business Administration permitted PPP borrowers to apply for a second draw PPP loan.[9] However, upon information and belief, *none* of the fraudulent PPP loan applications that Mr. Saab was

[8] See Vissers, Jason, *COVID RELIEF: CAN MY SMALL BUSINESS GET MULTIPLE EIDL LOANS?*, Merchant Maverick, April 7, 2021, available at https://www.merchantmaverick.com/apply-for-eidl-twice/

[9] *See, e.g.*, Gibson Dunn, *Small Business Administration Publishes Interim Final Rules for First Draw and Second Draw PPP Loans*, January 14, 2021, available athttps://www.gibsondunn.com/small-business-administration-publishes-interim-final-rules-for-first-draw-and-second-draw-ppp-loans/

involved with were second draw applications. Therefore, failed efforts to submit multiple first-draw PPP loan applications for the same companies cannot properly be added up for the purposes of establishing an intended loss figure.

While this is a case in which calculations of intended loss and actual loss yield more or less the same numerical amount, to the extent that intended loss yields a higher figure, our objections to the PSR, filed on March 1, 2024, address how the use of intended loss for purposes of establishing loss amount is nonetheless a disputed practice.

**The Fraud Amount**

Critically, the parties have agreed that the appropriate loss amount of 9.5 million dollars for Guidelines purposes. While we do not dispute this calculation of the "loss amount," we nonetheless view this Guideline range as vastly greater than necessary to meet the goals of sentencing in this case under 18 U.S.C. § 3553(a).

As the Second Circuit recognized in *United States v. Algahaim*, 842 F.3d 796 (2d Cir. 2016), the fraud guideline's overwhelming focus on the loss amount to the exclusion of other factors should lead courts to consider non-Guidelines sentences. *Id.* at 800. ("But the Commission could have approached monetary offenses quite differently. For example, it could have started the Guidelines calculation for fraud offenses by selecting a base level that realistically reflected the seriousness of a typical fraud offense and then permitted adjustments up or down to reflect especially large or small amounts of loss. Instead the Commission valued fraud (and theft and embezzlement) at level six, which translates in criminal history category I to a sentence as low as probation, and then let the amount of loss, finely calibrated into sixteen categories, become the principal determinant of the adjusted offense level and hence the corresponding sentencing range. This approach,

unknown to other sentencing systems, was one the Commission was entitled to take, but its unusualness is a circumstance that a sentencing court is entitled to consider.")

In considering the weight to be afforded to the Sentencing Guidelines in a particular case, the Supreme Court recognized that not all guidelines are equal: while some "exemplify the Commission's exercise of its characteristic institutional role," others do not. *Kimbrough v. United States*, 128 S. Ct. 558, 575 (2007). In cases involving application of Guidelines that "do not exemplify the Commission's exercise of its characteristic institutional role," it is "not an abuse of discretion for a district court to conclude when sentencing a particular defendant" that the application of the guideline "yields a sentence 'greater than necessary' to achieve § 3553(a)'s purposes even in a mine-run case." *Id.* In *Rita v. United States*, 551 U.S. 338 (2007), the Court reasoned that if a particular guideline was originally based on past sentencing practices, and revised in response to sentencing data and other research, then it seemed fair to assume that the recommendations truly embodied the statutory goals of §3553(a). *Id.* at 349. Conversely, when a guideline was not developed according to this practice, there was less reason to believe that it embodied the statutory objectives and deserved deference, even in a mine-run case. *Kimbrough,* 552 U.S. at 109.

Section §2B1.1 is one example of a Guideline that is not based on historical sentencing practices or research, rather is singularly focused on the overall loss amount, which is a poor measure of culpability. For this reason, the Second Circuit has invited District Courts to consider non-Guidelines sentences in fraud cases. *See Algahaim*, 842 F.3d at 800 ("Where the Commission has assigned a rather low base offense level to a crime and then increased it significantly by a loss enhancement, that combination of circumstances

entitles a sentencing judge to consider a non-Guidelines sentence."); *United States v. Corsey*, 723 F.3d 366, 379 (2d Cir. 2013) (Underhill, J., concurring) ("The loss guideline . . . was not developed by the Sentencing Commission using an empirical approach based on data about past sentencing practices. As such, district judges can and should exercise their discretion when deciding whether or not to follow the sentencing advice that guideline provides."); *see also United States v. Gupta*, 904 F. Supp. 2d 349 (S.D.N.Y. 2012) (Rakoff, J.) (describing how the fraud Guideline effectively ignores everything but loss amount and that many of the resulting Guidelines-recommended sentences are "irrational on their face").

For these reasons, and others, we urge the Court to consider a below-Guidelines sentence in this case.

## III. SENTENCING RECOMMENDATION

The government and the defense agree that the Guidelines range in this case is 78 to 97 months. Probation has calculated Mr. Saab's Guidelines as 151-188 months' imprisonment but has recommended that Mr. Saab received a non-Guidelines sentence of 108 months.

Probation's recommended variance is approximately 30 percent below the low end of its Guidelines calculation. In Part E, "Factors That May Warrant Departure/Variance", Probation writes:

> [T] he defendant endured a difficult childhood that was rife with physical abuse at the hands of his father. Instead of the father being held accountable for his actions, after the Administration for Children's Services opened an investigation, the defendant lied to the case worker to avoid his father from getting in trouble. Additionally, the defendant's five year-old son was diagnosed with severe autism which hinders his ability to speak and communicate with others, and requires various therapeutic measures and schooling. Should the Court

> find these circumstances compelling, they may be regarded as mitigating factors at sentencing.

(PSR ¶ 96.)

While, as addressed in our PSR objections, Probation has miscalculated the Guidelines based on a faulty understanding of intended loss, its determination that mitigating circumstances exist that warrant a sentence 30% below the low end of the Guidelines, rings true to defense counsel. Rami Saab is a flawed man who has made many, many poor choices in his life. He has cycled in and out of prison, committing crime after crime. He has taken advantage of efforts meant to help struggling businesses in the wake of the COVID-19 pandemic, depleting funds earmarked for those businesses, degrading confidence in government, and hurting his family. But the other side of the coin is a man who suffered significant traumas as a child and young adult, who cares deeply about family and friends and receives their love and support, as evidenced by the number of letters counsel received in connection with his upcoming sentencing, and upon whom many people depend. Rami Saab is a person who is actively working to come to terms with the errors of his life, to make up for the wrong he has done, and to make different choices going forward.

For these reasons, we respectfully request that this Court impose a sentence of 54 months, which is 30 percent below the low end of the 78-to-98-month guidelines range. This is a significant sentence, that will keep Mr. Saab incarcerated and away from his family for many years. But it is also a merciful sentence, a sentence that permits Mr. Saab and his family to hope and prepare for a different, not-to-distant future, and for Mr. Saab to put into place a plan to repay the fraud total as soon as possible.

Thank you for your kind consideration of this submission.

Respectfully Submitted,

Susan G. Kellman

Sarah Kunstler

Ezra Spilke